J-S15032-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: L.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: B.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 187 EDA 2022 |

Appeal from the Order Entered December 22, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000128-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: L.A.M.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: B.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 188 EDA 2022 |

Appeal from the Decree Entered December 22, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000159-2021

BEFORE:  NICHOLS, J., MURRAY, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.:            **FILED JULY 07, 2022**

B.M. ("Mother"), appeals from the decree granting the petition filed by the Philadelphia Department of Human Services ("DHS") to involuntarily terminate her parental rights to her son, L.A.M.B, also known as L.B. ("Child"),

and the order in Child's dependency case changing his permanency goal from reunification to adoption.[1]  We affirm.

The relevant facts and procedural history are as follows.  Child was born in 2015.  DHS initially became aware of the family in January 2018, when it received a General Protective Services ("GPS") report that Child's sibling had tested positive for marijuana at the time of his birth that month.  N.T., 12/13/21, at 13-14.  In March 2018, DHS received another GPS report when the same sibling was admitted to the hospital for an infection.  *Id*. at 14.  The GPS report indicated that Mother was at the hospital sweating profusely and speaking rapidly and nonsensically.  *Id*.  After leaving sibling at the hospital, Mother did not return for two days.  *Id*.  In April 2018, DHS implemented Community Umbrella Agency ("CUA") in-home services.  *Id*.

In December 2018, Mother gave birth to another child at thirty-two weeks of gestation.  Mother tested positive for marijuana at the time of that child's birth.  In January 2019, DHS obtained an Order of Protective Custody ("OPC") for Child and his siblings.  In March 2019, the family court held a hearing at which Child was not adjudicated dependent because the court gave Father full physical and legal custody.  N.T., 12/13/21, at 15.

In September 2019, DHS received a GPS report that during the summer Father had returned Child to Mother's care, although he knew she was not in a position to care for Child.  N.T., 12/13/21, at 15, 28.  The report further

---

[1] On December 22, 2021, the trial court terminated the parental rights of M.B. ("Father"), Child's biological father.  Father did not appeal.

alleged that Child, who was three years old at the time, had staples in his head from an unspecified injury, and Mother had not taken him to follow-up medical appointments. *Id*. The GPS report also stated that Mother had attempted to remove the staples herself, Child was extremely dirty and always hungry, and Mother was not caring for him properly. *Id*.

After validating the report, DHS obtained another OPC in September 2019. N.T., 12/13/21, at 16. On December 5, 2019, following a hearing, the trial court adjudicated Child dependent. *Id*. At that time, CUA provided Mother with the following Single Case Plan ("SCP") objectives:

> Mother's [SCP] objectives are . . . to comply with [Clinical Evaluation Unit], dual diagnosis evaluation and all recommendations, including three random [urine drug screens]; to attend [Achieving Reunification Center] to address housing, parenting, and employment; to comply with family school; to maintain supervised visits at the agency; to sign all necessary releases . . . [to obtain and maintain] housing; and to obtain and maintain employment.

*Id*. at 17.

In March 2021, DHS filed a petition for a goal change to adoption and another petition for the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). The trial court conducted two evidentiary hearings on both petitions in December 2021, when Child was six years old. Attorneys who served, respectively, as Child's guardian *ad litem* ("GAL"), and Child's legal counsel represented Child's interests at the hearings.

At the first hearing, CUA Case Manager Gabriela Gonzalez testified that Mother had not successfully completed any of her SCP objectives and had made no progress toward alleviating the issues that brought Child into care. N.T., 12/13/21, at 19, 26.  As the SCP reflected, Mother's drug use had been a significant concern to DHS, especially because of her drug use while pregnant, but Mother had not submitted any random drug screens or engaged in any dual diagnosis treatment program (*i.e.*, mental health and substance abuse treatment).  *Id*. at 17.  Ms. Gonzalez had reached out to the Clinical Evaluation Unit ("CEU"), but there was no record of Mother ever having gone to CEU.  *Id*. at 29.  Mother displayed limited insight into her need for the services the SCP recommended.  Ms. Gonzalez testified that, "[M]other has stated to me that there was no reason for [Child] to be removed from her in the first place, so there's no need for her to complete any services."  *Id*. at 18.

Ms. Gonzalez testified that Mother never progressed beyond supervised visitation, and had missed visits with Child for months at a time and his sixth birthday.  *Id*. at 19, 26-27, 30, 35-36.[2]

Mother's SCP objectives had also included attending Achieving Reunification Center ("ARC") classes to address her housing, parenting, and

---

[2] Ms. Gonzalez did not have the entire visitation schedule with her and therefore could not address Mother's visits in 2019 and 2020. N.T., 12/13/21, at 35.

employment issues. N.T., 12/13/21, at 17. Ms. Gonzalez testified that Mother had not completed any of her ARC classes. *Id*. at 18. Similarly, by the time of the first hearing, Mother had not engaged in family school, signed consents or releases, or cooperated with CUA's outreach. *Id*. at 18.

Ms. Gonzalez testified that Mother did not have a parental relationship with Child, but was more like a sister or a friend. N.T., 12/31/21, at 19. At the time of the hearing, Child had spent one-third of his life in care. Ms. Gonzalez testified that his current placement is a safe, loving, and supportive environment. *Id*. at 22-30. Child also has a close bond with his maternal aunt, who may adopt him, and with whom two of his siblings live. Child does not ask to see Mother. *Id*. at 23-25, 28, 38.

Mother, who was represented by counsel, testified that she had taken some parenting classes and had also started, but not completed, the employment workshop. She admitted that she had not completed any of the required ARC classes. She asserted that she had contracted COVID and "was going through physical stuff with myself, and I fell off." N.T., 12/13/21, at 43. She said that after DHS filed the involuntary termination petition, she voluntarily went to have an intake dual diagnosis assessment. *Id*. at 44. Mother also asserted that she had made monthly visits to Child in 2020 and 2021. *Id*. at 41-43. She testified that her lack of access to transportation and the theft of her phone impaired her ability to do random drug screens or dual diagnosis assessments. *Id*. at 43-44.

At the second hearing, forensic social worker Roya Paller testified that she had met with Child in May 2021, and December 2021, he understood the concept of adoption, he wants the stability that adoption affords, and he does not ask about Mother. N.T., 12/22/21, at 6-7, 10-11. Ms. Paller testified that Child would likely move to the home of his maternal aunt with two of his siblings. *Id*. at 11.[3] Child's GAL and legal counsel both argued in favor of termination of Mother's parental rights. *Id*. at 12-17. The trial court changed Child's permanency goal to adoption,[4] and by decree involuntarily terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).

Mother timely filed notices of appeal from the termination decree and goal change order, in addition to concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[5] In lieu of a Pa.R.A.P. opinion, the trial court directed this Court to its rationale for its decision articulated on the record at the December 22, 2021 hearing.

_____

[3] Child had previously lived with his maternal aunt and siblings, but moved to another foster home to accommodate his needs for therapy, and an individualized education plan at school. N.T., 12/13/21, at 23-24. Ms. Paller testified that DHS was likely to move Child to maternal aunt's home, N.T., 12/22/21, at 11, services having been identified. N.T., 12/13/21, 23-24.

[4] The trial court found that Father, who is not party to this appeal, had been non-complaint with his SCP objectives, not maintained contact with CUA or Child, and abandoned Child. N.T., 12/22/21, at 20-21.

[5] On February 7, 2022, this Court consolidated Mother's appeals *sua sponte*.

Mother presents the following issues for our review:

1. Did the Department of Human Services (DHS) sustain the burden that Mother's rights should be terminated[,] when there was evidence that Mother had completed and/or had been actively completing her permanency goals?

2. Was . . . sufficient evidence presented to establish that it was in the best interest of [Child] to terminate Mother's parental rights?

Mother's Brief at 4.[6]

Our standard of review of a decree involuntarily terminating parental rights is as follows:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. [A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (internal citations and quotation marks omitted). A trial court is free to believe all, part, or none of the evidence presented, and to make all credibility determinations and resolve conflicts in the evidence. *See In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). We will affirm a trial court's decision if competent evidence supports its factual

_____

[6] Child's legal counsel and GAL filed briefs in support of affirming the trial court's order and decree.

findings, even if the record could also support the opposite result. *See In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa. Super. 2003).

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. *See In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021).

Section 2511 of the Adoption Act governs the termination of parental rights and requires the trial court to conduct an analysis of the grounds for termination under section (a), followed, if it finds such grounds, by consideration of the needs and welfare of the child under section (b). The initial focus is on the conduct of the parent. *See In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007). The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies one of the statutory grounds for termination delineated in section 2511(a). *Id*. Only if the trial court determines that the parent's conduct warrants termination of her parental rights under section 2511(a) does the court engage in the separate section 2511(b) analysis, relating to the child's needs and welfare. *Id*. Clear and convincing evidence is defined as testimony that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (citation omitted).

In the case *sub judice*, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). To affirm a termination of parental rights, we need only agree with the trial court as to any one section of Section 2511(a), as well as section 2511(b). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Accordingly, we analyze the court's termination decree pursuant to section 2511(a)(8) and (b), which provides as follows:

> **(a) General rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * * *
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> * * * *
>
> **(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6), or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b).

To satisfy section 2511(a)(8), the petitioner must show three components: (1) the child has been removed from the care of the parent for at least 12 months; (2) the conditions which led to the removal or placement of the child still exist; and (3) termination of parental rights would best serve the needs and welfare of the child. **See In re Adoption of J.N.M.**, 177 A.3d 937, 943 (Pa. Super. 2018). Although we have recognized that the application of Section 2511(a)(8) may seem harsh when a parent has begun efforts to resolve the problems that had led to the removal of her child, we are cognizant that the statute implicitly recognizes "that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." **In re Adoption of R.J.S.**, 901 A.2d 502, 513 (Pa. Super. 2006); **see also id**. at 511-12 (holding that a parent's argument that there was a reasonable probability she could remedy the conditions that led to a child's removal from her care is irrelevant under subsection (a)(8)).

In her first issue, Mother argues that the record did not support the termination of her parental rights where she had completed and/or had been actively completing her permanency goals.[7] Mother's Brief at 4. Regarding

---

[7] We note with disapproval that Mother's brief uses Child's unredacted name.

- 10 -

section 2511(a)(8) specifically, Mother asserts that she is continuing efforts to attend therapy and treatment, is willing to reunify with her child, and has the current capacity to care for her child. *Id*. at 14.

The trial court found that Child has spent a substantial part of his life in care. He had been living apart from Mother at the time of the hearing for one month short of two years, eighteen months having expired between the September 2019 OPC and the March 2021 filing of the petition for termination of parental rights. *See* N.T., 12/22/21, at 20. The trial court also found that Mother had not engaged in substance abuse treatment or completed any ARC courses, had failed to consistently visit Child, and had made no progress toward alleviating the circumstances that led to the original placement. *Id*. at 20-21. Finally, the trial court found that termination of Mother's parental rights would be in Child's best interest, because Child has been placed in a home where he receives love and support, and may be moved to his aunt's home, where two siblings reside. *Id*. at 20-22.

After review, we conclude that the trial court's findings are supported by the record, and we discern no error of law or abuse of discretion. The first element of section 2511(a)(8) requires the removal of the child from the care of his parent for twelve or more months. Ms. Gonzalez's testimony established that Child was removed from Mother's care approximately eighteen months before the filing of the involuntary termination petition. *See* N.T., 12/13/22, at 15-16, 30.

The second element under subsection (a)(8) requires proof that the conditions that led to Child's removal continue to exist. Ms. Gonzalez's testimony established that element. It showed that Mother made little or no progress on her SCP goals before the filing of the involuntary termination petition. Specifically, despite her drug use history, Mother failed to submit random drug screens or engage in mental health and substance abuse training. *See* N.T., 12/13/21, at 17. Additionally, the CEU had no records of Mother ever attending their program. *Id*. at 29. Mother manifested her attitude about complying with the SCP when she told Ms. Gonzalez that Child had been removed from her without cause and therefore she had no need to complete any of the objectives in her SCP *Id*. at 18. Mother also failed to complete any ARC classes to address housing, parenting, and employment, did not engage in family school, did not sign consents or releases, and was not cooperative with CUA's outreach. *Id*. at 18. There was, therefore, ample support for the trial court's finding that Mother had made minimal, if any, progress on her SCP goals, and that the conditions that led to Child's removal from Mother continued to exist. *See* N.T., 12/22/21, at 21.

The third element under subsection (a)(8) is evidence that termination will best serve the Child's welfare. The evidence established that element as well. Child, six years old at the time of the hearing, had spent approximately one-third of his life in foster care, understood adoption, and wanted to be adopted. *See* N.T., 12/13/21, at 26; N.T. 12/22/21, at 6-7. Having heard

the evidence, the trial court concluded there had been "minimal, at best, compliance [by Mother] with the single case plan objectives," and that adoption was in Child's best interest. *See* N.T., 12/22/21, at 21. The trial court thus did not abuse its discretion in concluding that Child's safety, permanency, and well-being supported involuntary termination of Mother's parental rights. *See J.N.M.*, **supra**.[8]

Because we have determined that the trial court properly found that DHS met its burden under section 2511(a)(8), we next consider section 2511(b), which requires a court to "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). "The emotional needs and welfare of the child have been properly interpreted to include intangibles such as love, comfort, security, and stability." *T.S.M.*, 71 A.3d at 267 (citation and quotation marks omitted). Section 2511(b) requires us to consider the nature and status of the bond between a parent and child. *See In re E.M.*, 620 A.2d 481, 484-85 (Pa. 1993). In so doing, we recognize that even if there is a bond or attachment of a child to a parent, that bond will not necessarily result in the denial of a termination petition. *See T.S.M.*, 71 A.3d at 267 (acknowledging that even

---

[8] Mother's assertion that she is working to complete her SCP goals is irrelevant to the subsection (a)(8) analysis. *See R.J.S.*, 901 A.2d at 511-12; *see also In re William L.*, 383 A.2d 1228, 1241 (Pa. 1978) (asserting that the state should not be required to preserve a non-existent family relationship, and thereby consign a child indefinitely to "the limbo of foster care.").

children who suffer a parent's abuse and neglect may have a continuing attachment to that parent, which should not be misconstrued as bonding); *see also E.M.*, 620 A.2d at 484-85 (to the extent there is a bond, the trial court must examine whether termination of parental rights will destroy a "necessary and beneficial" relationship, thereby causing a child to suffer "extreme emotional consequences"). In evaluating a parent-child bond, the court need not use expert testimony, it may rely upon the testimony of social workers and caseworkers. *See In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010).

Although a parent's emotional bond with her child is a major aspect of a section 2511(b) best-interest analysis, it is only one of many factors to be considered by the court when determining the best interest of the child. *See In re M.M.*, 106 A.3d 114, 118 (Pa. Super. 2014). Moreover, "[t]he bonding cannot be in one direction only—that of child to the parent—but must exhibit a bilateral relationship which emanates from the parent['s] willingness to learn appropriate parenting . . . [and] . . . . drug rehabilitation. . . ." *In re K.K.R.-S.*, 958 A.2d 529, 534 (Pa. Super. 2008). "[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent." *Id*. (citation omitted); *see also Interest of L.W.*, 267 A.3d 517, 524 (Pa. Super. 2021) (stating that in determining the child's needs and welfare, the court may properly consider

the effect of the parent's conduct upon the child and consider "whether a parent is capable of providing for a child's safety and security or whether such needs can be better met by terminating a parent's parental rights.").

A child cannot be made to wait an excessive amount of time for the developmental help he needs. As we have recognized, in weighing the parent-child bond considerations pursuant to section 2511(b), courts must "keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *T.S.M.*, 71 A.3d at 269.

Mother argues that there was insufficient evidence to establish that it was in the best interest of the Child for her parental rights to be terminated. Mother's Brief at 15. She criticizes the trial court for relying upon the case manager's testimony instead of testimony from a DHS caseworker or a formal bonding evaluation, and she claims that the trial court was not presented with enough information to determine whether there was a bond between her and Child. *Id*. at 15-16.

The trial court determined that termination of Mother's parental rights was warranted to meet Child's needs and welfare, and that his placement in a loving foster home (and pending move to his aunt's pre-adoptive home, where he would reside with his siblings), served the goal of permanency as well as his best interest. *See* N.T., 12/22/21, at 21-22.

- 15 -

We conclude that the record supports the trial court's determination under section 2511(b) that termination of Mother's parental rights served Child's developmental, physical and emotional needs and welfare. Ms. Gonzalez testified that the Mother-Child relationship here was not a parent/child relationship, but more like a friendship. *See* N.T., 12/13/21, at 19. Additionally, Child looks to his current foster parent for his needs and comfort, and also to his maternal aunt for that support. *See id*. at 22, 28. Ms. Gonzalez also stated that Child does not ask about Mother and he would not suffer irreparable harm if Mother's parental rights were terminated. *See id*. at 19-20, 38.

Child's legal counsel, who agreed that Mother's parental rights should be terminated, presented the forensic social worker's testimony that showed that Child understood adoption, wanted to be adopted, and did not ask about Mother. *See* N.T., 12/22/21, at 6-7. Child is bonded with his maternal aunt, who is currently raising Child's siblings, and to whose house he is likely to be moved. *Id*. at 10-11.

Finally, we conclude that the trial court did not abuse its discretion by not ordering a bonding hearing. A trial court is not required by statute or precedent to order that a formal bonding evaluation be performed by an expert. *See K.K.R.-S.*, 958 A.2d at 533. Trial courts are permitted to rely on the testimony of social workers and caseworkers. *See Z.P.*, 994 A.2d at 1121. The testimony indicates that there is no parental bond between Mother

and Child. The trial court properly relied on this testimony. Furthermore, Child looks to his foster parent and maternal aunt, not Mother, for care and comfort. Accordingly, the trial court did not abuse its discretion in determining that termination of Mother's parental rights was in Child's best interest under section 2511(b).

Based on the foregoing, we affirm the decree terminating Mother's parental rights and the order changing the permanency goal to adoption.[9]

Decree affirmed. Order Affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

Date: 7/7/2022

---

[9] Although Mother filed a notice of appeal regarding the December 22, 2021 goal change order, her brief does not make an argument regarding this issue. Mother's decision to forego in her brief a challenge to the goal change order waives any such challenge. *See In re M.Z.T.M.W.*, 163 A.3d 462, 465-66 (Pa. Super. 2017) (holding that Court will not review a claim that is abandoned in an appellate brief). Moreover, even if Mother had not waived her challenge to the goal change to adoption, it would be moot in light of our decision to affirm the trial court's termination decree. *See In Interest of A.M.*, 256 A.3d 1263, 1272 (Pa. Super. 2021) ("Because we have concluded that the trial court did not abuse its discretion in granting the petition to terminate Mother's parental rights," this issue [a goal change to adoption] is moot.").